UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

JANET WING                              CIVIL ACTION NO. 6:11-cv-01963

VERSUS                                  JUDGE DOHERTY

MICHAEL J. ASTRUE,                      MAGISTRATE JUDGE HANNA
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION


## REPORT  AND  RECOMMENDATION


Before the court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be reversed and remanded.


## BACKGROUND

On June 1, 2010, the claimant, Janet Wing, applied for Social Security

Disability Insurance Benefits and/or a period of disability and also for Supplemental

Security Income, alleging a disability onset date of November 18, 2008.[1]  In a

contemporaneous disability report, she claimed that she is unable to work because of

the following conditions:  rheumatoid arthritis, fibromyalgia, basal cell carcinoma of

---

[1]        Rec. Doc. 7-1 at 112, 116.

the eyes, spurs in her upper back, and a bulging disk in her lower back.[2]  On May 17,

2010, the Commissioner initially denied Ms. Wing's claim.[3]  Ms. Wing requested a

hearing, which was held on March 22, 2011 before Administrative Law Judge

("ALJ") W. Thomas Bundy.[4]  On May 23, 2011, the ALJ issued an unfavorable

decision.[5]  The Appeals Council subsequently denied Ms. Wing's request for review

of the ALJ's decision.  Therefore, the ALJ's decision is the Commissioner's final

decision.  On November 14, 2011, Ms. Wing instituted this lawsuit, seeking judicial

review of the Commissioner's adverse decision.[6]

    Ms. Wing was born on October 15, 1961.[7]  She was 47 years old on her alleged

disability onset date and is currently 51 years old.  She attended two years of college,[8]

and she has worked as a clerk and cook in a deli, as a hostess in a restaurant, as a

---

[2]      Rec. Doc. 7-1 at 134.

[3]      Rec. Doc. 7-1 at 45, 46.

[4]      Rec. Doc. 7-1 at 34-44.

[5]      Rec. Doc. 7-1 at 18-29.

[6]      Rec. Doc. 1.

[7]      Rec. Doc. 7-1 at 112, 116.

[8]      Rec. Doc. 7-1 at 135.

practical nurse in a nursing home, and as a printer/binder for a newspaper and for a printing company.[9]

The record contains medical records for Ms. Wing covering an eight-year period of time during which she persistently complained and was treated for pain in her cervical spine, lumbar spine, left hip, and other joints.

On April 8, 2003, Ms. Wing was seen in the orthopedic outpatient clinic of the LSU Medical Center's W.O. Moss Regional Hospital in Lake Charles, Louisiana, for complaints of neck pain.  An MRI revealed mild degenerative joint disease and the doctor's diagnostic impression was piriscapular pain.  She was treated with physical therapy and NSAID pain relievers.[10]   She was treated for similar complaints at University Medical Center in Lafayette, Louisiana on June 10, 2007.[11]

From June 2003 through April 2008,[12] Ms. Wing received pain management treatment from Dr. Jacqueline Weil of the Affordable Healthcare Clinic for chronic neck pain related to cervical disc disease and osteoarthritis.[13]   Dr. Weil prescribed

---

[9]     Rec. Doc. 7-1 at 135.

[10]    Rec. Doc. 7-1 at 265.

[11]    Rec. Doc. 7-1 at 318-320.

[12]    Rec. Doc. 7-1 at 180-222, 228.

[13]    Rec. Doc. 7-1 at 228.

Lorcet or Lortab, Xanax, and Soma.[14]  On May 19, 2008, Dr. Weil opined that Ms. Wing is reasonably likely to miss an average of more than three days of work per month due to her medical impairments.[15]

On March 7, 2008, Ms. Wing sought medical assistance for drug dependance, reporting that she had been addicted to pain medications for more than three years.[16]

On September 16, 2008, Ms. Wing presented at the emergency room of University Medical Center ("UMC"), seeking assistance in detoxing from Soma, Xanax, and Lortab.[17]

Three days later, on September 19, 2008,[18] she was treated in the same emergency room for chronic low back and left hip pain, and she reported being out of medication.  Examination revealed a positive straight leg raise test on the left, tenderness to palpation (TTP) near the lumbar spine, and an altered gait secondary to

---

[14]     Rec. Doc. 7-1 at 181, 183-188, 190-191, 193-198, 200- 205, 207, 209, 213-214, 219-220, 222, 228.

[15]     Rec. Doc. 7-1 at 228.

[16]     Rec. Doc. 7-1 at 178.  The record index indicates that the documents at Rec. Doc. 7-1, pgs. 175-179 are from the Cleveland Medical Clinic.  However, the dates set forth in the index do not match those on the pages, and there is no information on these pages identifying the health care provider.

[17]     Rec. Doc. 7-1 at 315-316.

[18]     Rec. Doc. 7-1 at 311-314.

pain.  The diagnosis was low back pain with radiculopathy.  Lortab and Robaxin were prescribed.

On October 2, 2008,[19] she again visited the emergency room at UMC.  This time, she requested that her Lortab be refilled.  The staff explained that they were unable to comply with her request.

On October 15, 2008, Ms. Wing was x-rayed at UMC.[20]  The x-rays showed disc space narrowing at C4-5, C5-6, and C6-7, disc space narrowing at L3-4 with anterior spur formation, and calcification of the left shoulder suggesting calcific tendinosis.

On October 20, 2008,[21] Ms. Wing was treated at UMC's internal medicine clinic for joint pain and morning stiffness.  Examination revealed nodules in her finger joints, which are a sign of osteoarthritis.  Testing was ordered to rule out rheumatoid arthritis.

On November 4, 2008, an ultrasound examination of Ms. Wing's left hip region, which was taken at UMC, revealed a 2.5cm probable calcified mass beneath

---

[19]     Rec. Doc. 7-1 at 307-310.

[20]     Rec. Doc. 7-1 at 302.

[21]     Rec. Doc. 7-1 at 299-301.

the skin.[22]  On November 19, 2008, she was seen in the emergency room for a cystic mass of the right eye.[23]

On November 26, 2008, Ms. Wing was treated in UMC's internal medicine clinic for low back pain, joint pain, and a cyst on her hip.[24]  She reported morning stiffness, shoulder pain, and knee pain.  Examination revealed MCP nodules.[25]  The diagnoses were "rheumatoid/osteoarthritis," a calcified mass on the left hip labelled as myositis ossificans, and an eye cyst.  Myocitis ossificans is characterized by abnormal bone formation in the muscles or soft tissue, which can cause pain, limitation of joint movement, or nerve compression.[26]

An x-ray of Ms. Wing's left hip, taken on December 4, 2008, showed no fractures or dislocations and no acute bony abnormality.

---

[22]     Rec. Doc. 7-1 at 287-289.

[23]     Rec. Doc. 7-1 at 295.

[24]     Rec. Doc. 7-1 at 287-289.

[25]     "The metacarpophalangeal joint, or MCP joint, is one of five joints in each hand that connect the metacarpal bones in the palm to the phalangeal bones in the five fingers.  These joints are the large knuckles visible when the hand is clenched in a fist."  What is the Metacarpophalangeal Joint?, http://www.wisegeek.com/what-is-the-metacarpophalangeal-joint.htm (last visited Mar. 1, 2013).

[26]     Myositis Ossificans, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3236150/ (last visited Mar. 1, 2013).

On January 12, 2009, Ms. Wing was seen in the UMC ophthalmology clinic with regard to the cyst on her right eye.[27]   On January 26, 2009,[28] Ms. Wing was treated at UMC's internal medicine clinic, complaining of joint pain and fatigue. Examination revealed a decreased range of motion bilaterally in her hands, shoulders, and hips.  The diagnosis was arthritis.  The doctor noted that Ms. Wing's request for Lortab might have been drug seeking behavior, so she noted that no more Lortab should be prescribed.  She replaced the Lortab with Ultracet.

On February 2, 2009,[29] Ms. Wing was treated in UMC's internal medicine clinic for complaints of neck, shoulder, and back pain.  Examination revealed that she was tender to palpation, and the diagnosis was fibromyalgia.  The doctor declined to prescribe Lortab, but prescribed Lyrica.

On February 12 and 19, 2009, Ms. Wing was again treated in UMC's ophthalmology clinic with regard to her right eye.[30]

On March 10, 2009,[31] she was seen in UMC's internal medicine clinic with regard to fibromyalgia, neck pain, and left knee pain.  Examination revealed that she

---

[27]     Rec. Doc. 7-1 at 428-429.

[28]     Rec. Doc. 7-1 at 279-286.

[29]     Rec. Doc. 7-1 at 276-278.

[30]     Rec. Doc. 7-1 at 426-427.

[31]     Rec. Doc. 7-1 at 271-273.

was tender to palpation at the medial aspect of the left knee, the right shoulder, the neck, and the ankles.  Because her current medications were making her groggy and sluggish, the Lyrica and Ultram were discontinued, and he was prescribed physical therapy, Diclofenac (an NSAID pain reliever), and Elavil (an antidepressant).

On March 31, 2009,[32] Ms. Wing was again treated at UMC's internal medicine clinic for complaints of neck and low back pain.  The doctor's impression was chronic back pain.  Motrin and Ultram were added to her medications, and MRI studies were ordered.  The MRI of her cervical spine revealed spondylitic changes and disk bulging at C5-6 and C6-7 without significant canal or foraminal narrowing.[33]

On April 12, 2009, Ms. Wing was treated at Our Lady of Lourdes Hospital in Lafayette, Louisiana, for chest pain.[34]  She was tested and released with instructions to contact her physician at UMC for a stress test.

On May 4, 2009, Ms. Wing was treated at UMC's internal medicine clinic for increased hip pain and episodic chest pain.[35]  Examination revealed multiple sites of

---

[32]     Rec. Doc. 7-1 at 268-270.

[33]     Rec. Doc. 7-1 at 329.

[34]     Rec. Doc. 7-1 at 259-261.

[35]     Rec. Doc. 7-1 at 407-410.

pain, including tenderness in her back, left hip, and finger joints.  A walking cane was prescribed.[36]

On May 15, 2009, an MRI of Ms. Wing's left hip showed an old stress fracture involving the right sacrum.[37]

On July 22, 2009, Ms. Wing was seen in the emergency room at UMC for an allergic reaction to Ultram and Valtoren.[38]

On August 1, 1009, Ms. Wing was seen in the Lourdes emergency room for back pain with sciatica.[39]  She was prescribed Lortab, Flexeril, and Prednisone.

On August 31, 2009, Ms. Wing was again seen in the internal medicine clinic at UMC.[40]  She complained of neck pain, low back pain, and joint pain.  The doctor's impression was fibromyalgia.  Her Elavil and Lyrica prescriptions were maintained but Lortab was not prescribed.

---

[36]     Rec. Doc. 7-1 at 321.

[37]     Rec. Doc. 7-1 at 404.

[38]     Rec. Doc. 7-1 at 399-403.

[39]     Rec. Doc. 7-1 at 344, 336-338.

[40]     Rec. Doc. 7-1 at 395-398.

On September 2, 2009, Ms. Wing was seen in the emergency room at Lourdes for syncope (fainting) and seizure.[41]  She was advised to follow up with her doctor at UMC for an EEG.

On September 18, 2009, Ms. Wing was seen in the emergency department at UMC.[42]  She was complaining of increasing pain in her right arm, shoulder, and right elbow.  Lortab was prescribed.  X-rays taken the same day showed stable mild degenerative changes to the cervical spine at C4-5 through C6-7, as well as stable mild degenerative changes to the lumbar spine, with mild disk narrowing at all lumbar levels but most prominently at L3-4.[43]

On October 28, 2009, Ms. Wing was treated in UMC's internal medicine clinic.[44]  She complained of neck and low back pain, right leg pain, and bilateral hand pain.  Examination revealed decreased strength (3/5) in both hands as well as decreased strength (4/5) in both lower extremities.  She was referred to pain management.[45]

---

[41]     Rec. Doc. 7-1 at 242-245, 257.

[42]     Rec. Doc. 7-1 at 390-394.

[43]     Rec. Doc. 7-1 at 384-385.

[44]     Rec. Doc. 7-1 at 386-389.

[45]     Rec. Doc. 7-1 at 233.

On January 8, 2010, Ms. Wing was evaluated by Dr. William F. Kortum, a pain management physician, for cervical and lumbar spine pain, fibromyalgia, obesity, and depression.[46]  His examination revealed Ms. Wing to have decreased range of motion in the cervical spine and in the lumbar spine; decreased strength and abnormal reflexes in her left and right legs; parasthesia in her right arm; an unsteady gait with limp, weakness, and use of a cane; positive trigger points in her scapula, trapezius, rhomboid, and lumbar areas; and spasms in the scapular and trapazoid muscles.  His diagnosis was chronic pain syndrome, for which he prescribed Lortab, Mobic, and Prednisone.

On February 3, 2010, Dr. Kortum again noted objective signs supporting Ms. Wing's pain complaints, including decreased range of motion, muscle spasms, trigger points, and an unstable gait.[47]

On April 14, 2010, Ms. Wing was seen in the internal medicine clinic at UMC.[48]  She complained of bilateral leg pain and a lump in her throat.  Examination revealed sacro-iliac tenderness, and a lumbar MRI was ordered.

---

[46]     Rec. Doc. 7-1 at 324.

[47]     Rec. Doc. 7-1 at 323.

[48]     Rec. Doc. 7-1 at 381-383.

On April 16, 2009, UMC's Dr. Cesar Ramirez wrote a letter advising that Ms. Wing was unable to work full duty or to lift more than ten pounds due to a diagnosis of myalgia and myositis with widespread muscle pain, fatigue, multiple tender points and rheumatoid arthritis with severe joint pain.[49]

On May 4, 2010, Ms. Wing followed up with Dr. Kortum, who again noted spasms, trigger points, shooting pain to one shoulder, and decreased range of motion as well as a limp and weakness in her legs.[50]

On May 13, 2010, a lesion on Ms. Wing's lower right eyelid was biopsied.[51] She followed up with regard to that condition on May 17 and May 24, 2010.[52]

On May 25, 2010, Ms. Wing was treated at UMC's internal medicine clinic for bilateral hip and left leg pain.[53]  She was referred to the surgery clinic regarding the calcified mass in her left hip.

On June 9, 2010, Ms. Wing again visited Dr. Kortum, and his findings were similar to those of the prior visits.[54]  On June 21, 2010, Dr. Kortum wrote a letter

---

[49]     Rec. Doc. 7-1 at 266, 267.

[50]     Rec. Doc. 7-1 at 433.

[51]     Rec. Doc. 7-1 at 354-360.

[52]     Rec. Doc. 7-1 at 415-416.

[53]     Rec. Doc. 7-1 at 368-370.

[54]     Rec. Doc. 7-1 at 432.

noting: "She has had multiple injuries to her cervical and lumbar spine.  Her injuries are from several different auto accidents and poor genetics also complicate these injures by her chronic condition of obesity and fibromyalgia.  Her physical symptoms can be correlated by the radiographic studies.  She also complains of constant arthritic conditions in her hips, shoulder, neck and back.  I have examined her and find her complaints to be real.  Her physical exam is consistent with her symptomatic and chronic pain issues.  She has occasional weakness and sciatic symptoms which I believe are related to her injuries. . . .  She cannot lift much over 35 lbs, walk more than a block or two, stand, and or carry things for extended periods of time.  She occasionally walks with a limp and has a hard time in the mornings after inactivity."[55]

Ms. Wing followed-up with Dr. Kortum on July 5, 12010, August 3, 2010, and September 2, 2010, and his findings on those occasions were much the same as on prior visits.[56]

On August 3, 2010, Ms. Wing was treated at UMC's internal medicine clinic for pain in both legs.[57]  Examination revealed decreased range of motion and leg weakness.  The diagnosis was arthritis.

---

[55]     Rec. Doc. 7-1 at 431.

[56]     Rec. Doc. 7-1 at 462, 461, 460.

[57]     Rec. Doc. 7-1 at 451-453.

On August 27, 2010, Dr. Kenneth Ritter, an internist, examined Ms. Wing at the request of Disability Determination Services.[58]  He found that she ambulated normally, had a normal range of motion in her neck but complained of pain with motion, had a full and normal range of motion in her shoulders, elbows, and hands, and had normal grip strength in both hands.  He also found negative straight leg raises bilaterally.  He found her DIP joints (i.e., the end joints of her fingers) to be slightly tender, and he noted that her left knee was slightly enlarged and had slight lateral instability.  He agreed with her diagnosis of fibromyalgia but disagreed that she had been diagnosed with rheumatoid arthritis.  He admitted, however, that he had reviewed "very few medical records."

On October 13, 2010, Ms. Wing was seen at the internal medicine clinic at UMC for complaints of left hip pain radiating to her left leg.[59]  Upon examination, she had a positive straight leg raise as well as tenderness to palpation on the lumbar spine, paraspinal area, and left knee.  The diagnosis was arthralgia (i.e., joint pain), and she was referred for an orthopedic evaluation.

---

[58]     Rec. Doc. 7-1 at 435-439.

[59]     Rec. Doc. 7-1 at 448-450.

Ms. Wing followed up with Dr. Kortum on October 5, 2010, November 3, 2010, December 3, 2010, January 3, 2011, and February 3, 2011.[60] At each of those appointments, Dr. Kortum recorded his detailed findings, which are very similar to those from prior visits.

On February 15, 2011, Ms. Wing was treated in UMC's internal medicine clinic for pain in her left hip radiating down to her left knee as well as back pain.[61]

At the administrative hearing on March 22, 2011, Ms. Wing testified that she has been unable to work since November 2008 when the pain in her back and arms made her miss too much work as a hostess at a Cracker Barrel restaurant.[62] She complained about back, neck, and knee pain; jerky movements that she claims are a side effect of her medications; and deteriorating eye sight.[63] She explained that she has been diagnosed with fibromyalgia, which affects her balance.[64] She stated that she uses a cane to help with her balance and the unsteadiness of her left knee.[65] She

---

[60]     Rec. Doc. 7-1 at 459, 458, 469, 468, 467.

[61]     Rec. Doc. 7-1 at 474-476.

[62]     Rec. Doc. 7-1 at 36-37.

[63]     Rec. Doc. 7-1 at 37.

[64]     Rec. Doc. 7-1 at 38.

[65]     Rec. Doc. 7-1 at 39.

stated that she could not get through a work day without lying down[66] and can sit for only about thirty minutes at a time without standing up or lying down.[67]  She also testified that her medications make her dizzy, sleepy, or blur her vision.[68]

In this appeal, Ms. Wing seeks reversal of the Commissioner's adverse ruling.

## ASSIGNMENT OF ERRORS

Ms. Wing contends that the Commissioner's decision is not supported by substantial evidence for three reasons:  (1) the ALJ failed to find, at step two of the sequential evaluation process, that Ms. Wing's osteoarthritis, fibromyalgia, and myositis ossificans are severe impairments; (2) the ALJ failed to properly evaluate the treating source medical opinions of Drs. Weil, Ramirez, and Kortum; and (3) the ALJ failed to consider all of Ms. Wing's impairments and her need for a cane when assessing her residual functional capacity.

---

[66]     Rec. Doc. 7-1 at 40.

[67]     Rec. Doc. 7-1 at 42.

[68]     Rec. Doc. 7-1 at 42.

## STANDARD OF REVIEW

This Court's review of the Commissioner's decision is limited to determining whether the decision was supported by substantial evidence and whether the proper legal standards were applied in reaching the decision.[69]  If the Commissioner's findings are supported by substantial evidence, they must be affirmed.[70]  Substantial evidence is more than a mere scintilla and less than a preponderance.[71]  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision.[72]  Finding substantial evidence requires scrutiny of the entire record as a whole.[73]  In applying this standard, the court may not re-weigh the evidence or substitute its judgment for that of the Commissioner.[74]

---

[69]   *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001); *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000).

[70]   *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[71]   *Boyd v. Apfel,* 239 F.3d at 704; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

[72]   *Boyd v. Apfel,* 239 F.3d at 704.

[73]   *Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir. 1986).

[74]   *Boyd v. Apfel,* 239 F.3d at 704; *Carey v. Apfel*, 230 F.3d at 135.

## DISCUSSION

A claimant seeking Social Security benefits bears the burden of proving that he or she is disabled.[75]  Disability is defined in the Social Security regulations as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[76]  Substantial gainful activity is defined as work activity involving significant physical or mental abilities for pay or profit.[77]

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a severe impairment will not be found disabled.

---

[75]  *Perez v. Barnhart*, 415 F.3d 457, 461-62 (5th Cir. 2005); *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992); *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1301 (5th Cir. 1987).

[76]  42 U.S.C. § 423(d)(1)(A).

[77]  20 C.F.R. § 404.1572(a)-(b).

3.   An individual who meets or equals an impairment listed in the regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1 will be considered disabled without consideration of vocational factors.

4.   If an individual is capable of performing the work he has done in the past, a finding of not disabled must be made.

5.   If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if the claimant can perform any other work.[78]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[79] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the claimant's record.[80]  The claimant's residual functional capacity is used at the fourth step to determine if the claimant can still do his past relevant work, and is used at the fifth step to determine whether the claimant can adjust to any other type of work.[81]

---

[78]    *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991), summarizing 20 C.F.R. § 404.1520(b)-(f).  See, also, *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d 267, 271-72 (5th Cir. 2002); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

[79]    20 C.F.R. § 404.1520(a)(4).

[80]    20 C.F.R. § 404.1545(a)(1).

[81]    20 C.F.R. § 404.1520(e).

The claimant bears the burden of proof on the first four steps.[82]  At the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[83]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[84]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[85]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[86]

In this case, the Commissioner found, at step one, that Ms. Wing has not engaged in substantial gainful activity since November 18, 2008, the alleged onset date of her disability.[87]  That finding is supported by evidence in the record.

---

[82]    *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[83]    *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[84]    *Fraga v. Bowen*, 810 F.2d at 1304.

[85]    *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[86]    *Anthony v. Sullivan*, 954 F.2d at 293, citing *Johnson v. Bowen*, 851 F.2d 748, 751 (5th Cir. 1988).  See, also, 20 C.F.R. § 404.1520(a)(4).

[87]    Rec. Doc. 7-1 at 21.

At step two, the ALJ found that Ms. Wing has the following severe impairments:  degeneration disease of the spine.[88]  This is also supported by evidence in the record.  However, it ignores other medical conditions with which Ms. Wing has also been diagnosed and which she argues are also severe.

At step three, the ALJ found that Ms. Wing does not have an impairment or a combination of impairments that meets or medically equals one of the listed impairments.[89]

The ALJ then found that Ms. Wing has the residual functional capacity to perform the full range of light work.[90]  At step four, the ALJ found that Ms. Wing is capable of performing her past relevant work as a deli clerk/cook.[91]  Accordingly, the ALJ found that Ms. Wing was not disabled from November 18, 2008 through the date of the decision.[92]  Ms. Wing argues that the ALJ erred in three ways, each of which will be discussed below.

---

[88]     Rec. Doc. 7-1 at 21.

[89]     Rec. Doc. 7-1 at 21.

[90]     Rec. Doc. 7-1 at 21.

[91]     Rec. Doc. 7-1 at 28.

[92]     Rec. Doc. 7-1 at 28.

**(1)   THE ALJ ERRED IN DETERMINING MS. WING'S SEVERE IMPAIRMENTS**

Ms. Wing's primary complaint is chronic pain.  Pain constitutes a disabling condition only when it is constant, unremitting, and wholly unresponsive to therapeutic treatment.[93]   However, pain may also constitute a non-exertional impairment that limits the range of jobs a claimant otherwise would be able to perform.[94]  Therefore, the ALJ must give consideration to the claimant's subjective complaints of pain; and the ALJ has a duty to make affirmative findings regarding the credibility of the claimant's assertions regarding pain.[95]  "There must be clinical or laboratory diagnostic techniques which show the existence of a medical impairment which could reasonably be expected to produce the pain alleged."[96]

Here, Ms. Wing has complained primarily of cervical pain, lumbar pain, joint pain, and pain in her left hip.  Her doctors have diagnosed her with osteoarthritis based on clinical signs including joint nodules or tenderness, elevated ESR levels, decreased range of motion in her joints, decreased reflexes and decreased strength, as detailed above.  She has also been diagnosed with fibromyalgia based on the

---

[93]   *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994).

[94]   *Fraga v. Bowen*, 810 F.2d at 1304.

[95]   *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981).

[96]   *Selders v. Sullivan*, 914 F.2d at 618.

presence of trigger points, as was also noted above. She has been diagnosed with myositis ossificans based on objective signs including an ultrasound examination, again noted above. All three of these conditions – osteoarthritis, fibromyalgia, and myositis ossificans – are capable of causing pain. Dr. Kortum noted that Ms. Wing's spinal injuries, fibromyalgia, and arthritis are all supported by radiologic studies and physical examination findings. Although he did not detail those findings in the letter setting forth his opinion, a review of the record reveals this to be the case. Despite this wealth of medical evidence, however, the ALJ found that Ms. Wing has only one severe impairment, degenerative disease of the spine.

An impairment is not severe "only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."[97] Osteoarthritis, fibromyalgia, and myositis ossificans may produce pain and other symptoms that can interfere with an individual's ability to work. Accordingly, the undersigned finds that the ALJ's conclusion that these are not severe impairments is not supported by the evidence in the record. Accordingly, the undersigned

---

[97] *Loza v. Apfel*, 219 F.3d 378, 391 (5th Cir. 2000) (citation and internal quotation marks omitted). See, also, *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985).

recommends that this matter be remanded so that this finding by the ALJ can be reviewed.


### (2) THE ALJ FAILED TO PROPERLY EVALUATE THE TREATING SOURCE MEDICAL OPINIONS OF DRS. WEIL, RAMIREZ, AND KORTUM

Ms. Wing's next argument is that the ALJ failed to give her treating physicians' opinions appropriate weight.  The ALJ has sole responsibility for determining the claimant's disability status.[98]  However, even though a treating physician's opinions are not determinative, the opinion of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be accorded great weight by the ALJ in determining disability.[99]  In fact, when a treating physician's opinion regarding the nature and severity of an impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the ALJ must give that opinion controlling weight.[100]

---

[98]     *Newton v. Apfel*, 209 F.3d at 455.

[99]     *Pineda v. Astrue*, 289 Fed. App'x 710, 712-713 (5th Cir. 2008), citing *Newton v. Apfel*, 209 F.3d at 455.

[100]    20 C.F.R. § 404.1527(c)(2).  See, also, *Loza v. Apfel*, 219 F.3d at 393.

-24-

If an ALJ declines to give controlling weight to a treating doctor's opinion, he may give the opinion little or no weight – but only after showing good cause for doing so.[101]   Good cause may be shown if the treating physician's opinion is conclusory, unsupported by medically acceptable clinical laboratory diagnostic techniques, or is otherwise unsupported by the evidence.[102]   Before declining to give any weight to the opinions of a treating doctor, an ALJ must also consider the length of treatment by the physician, the frequency of his examination of the claimant, the nature and extent of the doctor-patient relationship, the support provided by other evidence, the consistency of the treating physician's opinion with the record, and the treating doctor's area of specialization, if any.[103]

In this case, the ALJ rejected Dr. Ramirez's and Dr. Kortum's opinions because "[t]hey are not sufficiently supported by detailed references to specific findings, and really constitute nothing more than speculation.  As such they are not entitled to significant evidentiary weight."[104]   This statement is inconsistent with the record.  In particular, Dr. Kortum's treatment notes for each and every visit with Ms. Wing

---

[101]     *Thibodeaux v. Astrue*, 324 Fed. App'x 440, 443-444 (5th Cir. 2009).

[102]     *Thibodeaux v. Astrue*, 324 Fed. App'x at 443-444.

[103]     *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001); *Newton v. Apfel*, 209 F.3d at 456.

[104]     Rec. Doc. 7-1 at 26-27.

provide extensive details regarding his examination of her body and how it functions.[105]

The ALJ also said "there has never been motor, sensory, neurological, reflex or circulatory deficits on clinical examination."[106]  This is incorrect.   Decreased strength and reflexes have been noted on several occasions by Ms. Wing's physicians, as have trigger points and muscle spasms, as was noted in the factual recitation in a preceding section of this report.

To bolster his rejection of Ms. Wing's treating physicians' opinions, the ALJ also said: "Straight-leg-raising test results have been consistently negative for sciatic nerve irritation."[107]  The evidence in the record does not support this statement.  Ms. Wing's doctors noted positive straight leg raise tests on at least two separate occasions, as noted above.

The ALJ also said, "Nor have there ever been. . . persistent, significant and objective limitations in ranges of motion, in any of the body areas allegedly affected." Again, the evidence in the record contradicts the ALJ's statement.  An examination at UMC in January 2009 revealed decreased range of motion in her hands, hips, and

---

[105]     Rec. Doc. 7-1 at 458-462.

[106]     Rec. Doc. 7-1 at 24.

[107]     Rec. Doc. 7-1 at 24.

shoulders; Dr. Kortum found decreased range of motion in the cervical and lumbar spine in January 2010, and a decreased range of motion was again found at UMC in August 2010, as was noted above with citation to the record. Just these three examples reveal decreased range of motion over a period of more than a year and a half.

The undersigned finds that the ALJ improperly discounted the opinions of Ms. Wing's treating physicians' opinions by ignoring important objective data set forth in the physicians' treatment notes that is inconsistent with the ALJ's conclusions regarding the nature and severity of Ms. Wing's impairments. The law is clear that "[t]he ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."[108] In this case, however, the ALJ ignored a great deal of information contained in the doctors' clinical notes. Accordingly, the undersigned finds that the ALJ failed to apply the proper legal standard when deciding to reject the opinions of Ms. Wing's doctors and reached a conclusion that is not supported by the record as a whole. Therefore, the undersigned recommends that this matter be reversed and remanded for further consideration particularly in light of the treating physicians' opinions.

---

[108]     *Loza v. Apfel*, 219 F.3d at 393.

### (3) THE ALJ FAILED TO CONSIDER ALL OF MS. WING'S IMPAIRMENTS AND HER NEED FOR A CANE WHEN ASSESSING HER RESIDUAL FUNCTIONAL CAPACITY

Ms. Wing's third assignment of error is that the ALJ failed to properly evaluate her residual functional capacity, particularly in light of the impairments that the ALJ did not find to be severe as well as her doctor's prescription for a cane and her use of that assistive device.

As noted above, the undersigned is recommending that this matter be remanded for reconsideration of whether Ms. Wing has severe impairments in addition to those found by the ALJ.  That recommendation necessitates a new evaluation of her residual functional capacity.

Additionally, the ALJ failed to consider the effect that Ms. Wing's use of a cane might have on her ability to perform light work, presumably relying on the consulting physician's statements that she walked normally despite left knee instability and could perform light work and presumably ignoring Ms. Wing's testimony that she uses a cane because she has a weak knee and balance issues.  An ALJ is obligated to evaluate and weigh all of the medical source opinions and articulate the reasons underlying the decisions he makes based on those opinions.[109] While opinions on the ultimate issue of disability status are reserved to the ALJ, he

---

[109]    See generally 20 C.F.R. § 404.1527(b), (d).

must consider all medical opinions.[110]   In this case, however, the ALJ ignored Dr. Kortum's observation that Ms. Wing uses a cane and also ignored the fact that Dr. Lindwall prescribed a cane for Ms. Wing.

Accordingly, the undersigned finds that the ALJ's evaluation of Ms. Wing's residual functional capacity was flawed because it was not based on all of the relevant evidence in the record and because it is inconsistent with relevant medical evidence in the record.   Therefore, the undersigned recommends that the Commissioner's ruling be reversed and remanded for further evaluation of Ms. Wing's residual functional capacity.

## CONCLUSION AND RECOMMENDATION

For the reasons explained above,

**IT IS THE RECOMMENDATION** of the undersigned that the decision of the Commissioner be REVERSED and REMANDED for further consideration in accordance with the foregoing discussion.   In particular, the Commissioner should evaluate whether Ms. Wing has any severe impairments in addition to the one severe impairment found by the ALJ, give Ms. Wing's treating physicians' opinions

---

[110]     20 C.F.R. §§ 404.1527(b), (d)(1), 416.927(b), (d)(1).

appropriate weight, and thoroughly reevaluate Ms. Wing's residual functional capacity.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed at Lafayette, Louisiana, this 7th day of March 2013.

_____

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE